We'll hear the first orally argued case, Zuckerman. Good morning, Your Honors. May it please the Court, I am Lawrence Kay, a member of the firm of Herrick Feinstein, attorneys for Plaintiff Appellant. I am standing before you today to ask you to undo a gross injustice and reverse the District Court's decision dismissing the amended complaint, in this case, on a 12b6 motion. At the heart of the case is Plaintiff's claim, set forth in detail in her amended complaint, that her great-great-uncle and aunt, Paul and Alice Lefman, were forced to sell their last valuable possession, the Picasso painting that is the subject of this case, in order to escape Nazi and fascist persecution, and to fund their escape from fascist Italy in 1938. We respectfully submit that under the circumstances, it was error for the District Court to dismiss the amended complaint without giving Plaintiff her day in court to prove her case. I submit that the decision below is infirm for at least four reasons. First, instead of accepting the well-pled allegations of the complaint and drawing all inferences in favor of Plaintiff, the Court made findings of fact that are inconsistent with the allegations of the complaint and drew every inference against the Plaintiff. Second, the District Court dismissed the amended complaint because it held that there is a categorical bar to any claim that asserts third-party duress in New York. Simply put, there is no such bar to third-party duress in New York. Rather, as the cases and other authorities, including the restatements of contract and restitution, make clear, third-party duress is actionable in New York so long as the counterparty to the transaction has knowledge of the duress, as is alleged in the amended complaint, and this Court recognized that in its decision in Eilean v. Huntington, cited on pages 38 and 39 of our opening brief. Third, the District Court improperly characterized the sale of the actor as a run-of-the-mill commercial transaction, ignoring the allegations of the complaint that the contract was entered into by German Jews on the run, seeking to escape fascist Italy before it was too late, and giving no weight to the allegations detailing the concrete and very real threats to the leftman's safety and life. Rather, the Court relied solely on cases where it was alleged only that parties in ordinary commercial transactions were induced to enter into agreements because of personal economic problems or general economic conditions, and the Court refused to acknowledge or take into account the very different facts of this case, where, as pleaded, the leftman's sale of the actor was a life-or-death decision, as they sold the picture only because of a real and palpable fear that they would face imprisonment or deportation to a concentration camp if they did not escape from fascist Italy before the imposition of racist laws that were imminent, and that they needed every penny. The complaint does not appear to allege threats that are specific to the contract at issue. So, yes, I hear and understand your argument about the general situation of duress that the parties were facing, but what about the absence of threats specific to extort this particular contract? Is that not necessary? It's not exactly the way to phrase it, Your Honor, with all due respect. What has to happen is that there has to be a targeted threat that compels action by the victim, and that they would not have entered into that contract except for that duress that's imposed upon them. General conditions are not enough, but in this case, and as outlined in the complaint in great detail, and I would also invite your attention to the brief submitted on behalf of the Italian historians, which also lays it out in great detail, the leftmen were not only Jews, they were German Jews living in Italy. They were specifically targeted. As we lay it out in the complaint and in that other brief, they lay it out. The foreign Jews in particular were targeted. They had to submit to a consensus. To a census, they were being watched. They were being deprived of specific rights. They couldn't work. In particular, in Florence, where the leftmen resided, the Nazis followed them, so to speak, from Germany. The police came. They had an agreement with the Italian police. They were looking at Jews. When Hitler came to Florence in May of 1938, just a month before the sale of the painting, they arrested hundreds of foreign Jews based on the census and put them in jail, almost to hold them as hostages so that Hitler would leave Italy safely. The leftmen lived around the corner from where Hitler marched down the street with swastikas hanging. This was a clear, targeted, direct threat against the leftmen as German Jews living in Florence at the time. Can I move you to a question about statute of limitations and the HERE Act? Certainly. To get out of the statute of limitations issue, one might try to see how the HERE Act applies. Looking at the HERE Act, as I read the text of the HERE Act, it seems to deal with work that was confiscated by the Nazis in some direct or active way, or looted by the Nazis in some act or directed way. There is some language at the very beginning that talks about the statute that talks about work that was lost, but the thrust of the text of the language is to deal with artwork that was sold under duress or looted by Nazis or Nazi affiliates. There's an early version of the bill that did deal, arguably, with those in this situation where somebody feels compelled to sell something because of the general Nazi threat and does so under duress. But that language does not appear in the final text of the bill. So if you could help me understand how the HERE Act applies, because if it doesn't work for you, then there is a statute of limitations issue, arguably. Yes, Your Honor, I'll start with the statute of limitations. We don't need the HERE Act to survive a statute of limitations challenge. In New York, the statute of limitations is based on demand and refusal. When a purchaser claims to be a purchaser in good faith, as the museum does here, the cause of action does not arise until a demand is made on the possessor in good faith and that demand is refused. In this case, that was done timely and we entered into a stance agreement before it would have expired. Indeed, I don't think it was ever refused until the case was brought. So we believe we are timely under New York law. As to the HERE Act- So let me, before you get to the HERE Act, just so I understand the demand and refusal, the Met received the painting in 1952 and the first demand from the Leffman Estate appears to be in 2010. And as I understand the demand and refusal rule, there can't be unnecessary delay. It's a long time between 1952 and 2010. It is, Your Honor, but the Guggenheim case in New York and other cases make clear that the issue of unreasonable delay does not go to the demand and refusal rule. It goes to the issue of latches. And that is a fact-intensive inquiry that is not appropriate to be decided on a motion to dismiss. Indeed, the judge did not decide that issue. And that would require an analysis not just of why the demand wasn't made earlier, but the conduct of the defendant, as the Guggenheim case explains, is critical. Their vigilance, the equities, all have to be considered. What did they not do? And as we lay out in our complaint, we believe they did not do enough, that they were negligent, and that any latches defense would be precluded by the unclean hands of the Metropolitan. They didn't put it in their catalog until 1967, a year after the last death of the Leffmans. They then put the wrong provenance in, as is laid out in our amended complaint, and that was not corrected until after the plaintiff here started communicating with them. Even when they had a huge exhibition featuring the actor, they still had the wrong provenance in it. So we believe that that's a function of latches, that we are very timely on the statute of limitations under demand and refusal in New York. Would you like me to go back to the- Yeah, they do use the word confiscation, Your Honor. And though, but looking as you point out at the legislative history at the preamble of the current of the bill that was enacted, there's no doubt that they are focusing on property lost as a result of persecution, not only by the Nazis, but by their allies, it specifically states that. And in terms of what confiscation means these days, one of the specific references in the HERE Act is to the Terrorism Declaration. That's a declaration that followed the Washington principles by about 10 years, and both the Washington principles and the Terrorism Declaration provide for the signatory countries, which include the United States, to use everything in their warehouse to try to get property lost during the Holocaust returned. And in the definition of confiscation in the Terrorism Declaration, again specifically referred to in the HERE Act, it equates sales by duress with thefts by the Nazis. So we believe, Your Honor, that looking at the HACT, the legislative history, the Terrorism Declaration, and other authorities, including the recent Reif-Inegi case in New York, that there's no doubt a sale by duress was contemplated by the HERE Act. And if for any reason we were unable to utilize the HERE Act, though I believe it is applicable, we believe we're timely under demand and refusal and there would be a laches inquiry at some point in the case. The normal form in statutory language when something is incorporated, like the Terrorism Declaration, is to say that the X, the Terrorism Declaration, is incorporated. But the HERE Act doesn't say that. It talks about the policy. The policy is a much looser expression than to say that the terms of the act or the declaration are incorporated in the HERE Act. I'm not saying, Your Honor, that only the definition in the Terrorism Declaration, that that's the only reason that the two are equated. Judge Rakoff, in the Schoeps case in 2009, which came down shortly before the Terrorism Declaration was adopted in 2009, also equated sales by duress with theft. Wasn't that a case in which the duress analysis is under German law, in the Schoeps case? It was under German law, but it said if objects lost by function of duress came to the United States, they would be treated as void, not voidable, because he equated the duress sales with thefts and cited all of the famous art theft cases involving the Holocaust, which I'm familiar with. And so I believe that under the statutes and under the cases that at this time the jurisprudence is clear that an art lost by duress as a result of persecution by the Nazis or their allies, which would include the fascists in Italy, is clearly covered in the form of losses during the Holocaust, whether they're called confiscation or anything else. And yes, and I'm looking at the provision in the HERE Act when they say that to ensure that the laws governing claims of Nazi-confiscated art and other property, further U.S. policy is set forth in the Washington Principles, the Holocaust Victims Redress Act, and the Terrorism Declaration. Recently, I think it was 2014, the Ninth Circuit Court of Appeals looked at the Washington Principles and the Terrorism Declaration and said that that is a function of U.S. policy, that courts should do everything in their power to follow. Judge Ramos said the same thing, even though he was dealing with the statute of limitations. He noted that the policy underlying the HERE Act was that all lost property had to be returned. That's also the point of the Washington Principles, which the Terrorism Declaration followed up on and made it a little stronger. So I think when you put all of that together, and there are more authorities cited in our brief, there's no doubt that under current jurisprudence, a loss of property by duress, caused by persecution of the fascists or the Nazis, clearly falls within the rubric of the HERE Act. As I say, if there's any disagreement on that, Your Honor, I believe under the New York Demand and Refusal Rule, this case is timely, and I submit that when all the factors of both the plaintiff's diligence and the defendant's vigilance are looked at on a fact-based inquiry as the case goes forward, that we will prevail on laches as well. It's worth noting under the Petrella case of the Supreme Court, that if the HERE Act did apply, we believe that under Petrella, which says if a case is timely under a federal statute, laches is not available, that we'd also not necessarily have a laches inquiry. But again, we believe it would be precluded by the facts and by the claim we have of unclean hands. Can I just ask you to go back to the third-party duress issue? Do you know of any New York State court decisions that have specifically said that third-party duress is adopted as New York law, that provision in the restatement? I don't believe there's a New York State case that's done it, but as I said, this case, that has done it twice, both in the case I mentioned, Ayala, and in the Oquendo case. Other states have adopted it, such as Maryland. Ayala was a summary order, right? Ayala was a summary order, but it was very specific and I believe cited the restatement of restitution. Why shouldn't this . . . since there is no New York State case on the issue, why shouldn't we certify that issue to the New York State Court of Appeals? That certainly is a possibility, Your Honor. We think that under the New York State cases, which specifically do not preclude . . . There's no New York State case at any level that precludes third-party duress. Certainly this court and the district court have read the New York cases, which I believe New York does adhere to the restatement, and said that that third-party duress is viable in New York. But if you felt there was any question and needed a higher court to say that . . . The other thing is that we believe that even under the cases cited by the defendant and the court, particularly the Interform case, which says there wasn't enough economic pressure there for duress to be held, that this is a set of extraordinary facts that Interform said, if you have a set of extraordinary facts, we'll look at duress differently. I don't remember if that was a third-party duress case, but Your Honor, the same thing would apply to third-party duress. And indeed . . . Your adversaries would say that the Lefmans were dealing with purchasers who were not Nazis, and that they took some time to think about which offers they wanted to make. It's undeniably the case that they sold it for bargain-basement prices, and three years later, it was selling for more than a few times the amount. But isn't there something to the view that you're dealing with purchasers like Paul Rudd, or Rosenberg, and Pearls? Certainly Rosenberg was not a Nazi. And we don't suggest that they are, Your Honor. But we do suggest, and we allege it in the complaint, that they were well aware of the plight of the Lefmans in Italy. Indeed, as the brief submitted by the Italian historians says in great detail, with great authority, all of the major dealers in Europe knew what was going on in Italy at the time. So they totally fit within the restatement rule that if the counterparty has knowledge of the duress, of the threat, then clearly third-party duress is viable. Also, Your Honor, and it's an issue that troubles me greatly because it flows from what I said first, that the court made findings of fact inconsistent with the complaint and drew inferences against the plaintiff. The fact of the matter is, as the court said and the defendants say, and it's irksome, the Lefmans were not trying to sell this picture for two years. What happened was in 1936, while still in Nazi Germany, while beginning to suffer the plight there, someone made an unsolicited offer to them of about the same amount that they ultimately sold it for, and they rejected it outright. They didn't even talk to them. And that was while they were in Nazi Germany, getting ready to flee there. And certainly that didn't indicate that they were looking to sell it. As they got to Italy, thinking they were coming to a safe haven and finding the Nazis followed them and that things were getting worse by the day, of course they started to think about selling it. They were going to need every penny they had. Even though they were able to exchange some property after they got there, they got lira for them, not hard currency, which was going to, as our brief points out, was not going to be helpful to them in escaping. They needed every penny they could get. They had this painting sitting in Switzerland. They needed to sell everything, and they would never have sold this painting except that they were under true horrific duress. And in fact, I would just like to add, Your Honor, as we say in our brief, this was not just economic duress. This qualifies as duress by violence because this was a threat tantamount to violence, as the restatement makes clear and certain of the cases make clear. This was a threat that would lead any reasonable person to fear for their safety, their life, and imprisonment. And that qualifies under the law as physical violence, and that would render the agreement void. And we believe the agreement is void, ab initio, because of what was happening to the Lefmans in Florence at the time they sold the painting. Let's say that the court were to disagree and to say that, just for the sake of argument, that the sale was voidable but not void. Then what's the argument against the view that the Met acquired a good title to the painting when it was donated by Thelma Chrysler Foy, who would be considered a good faith purchaser of the painting in 1941? Your Honor, hypothetically, Judge Rakoff addressed that issue, even though he was dealing with foreign law in the Shipps case, and said, based on everything I've said, and the Terrorism Declaration hadn't even been signed yet, he equated property taken by theft or by duress with theft as far as U.S. cases were concerned and would not treat that as a voidable sale. Plus, the notion of ratification would have to come in, and clearly, as we allege in the complaint, when the Lefmans are on the run, having to go temporarily to Switzerland, then to Brazil, not getting back until the 1950s, clearly ratification was not a viable option, something that we could blame them for. You and your adversaries have a disagreement about the claims that the Lefmans made with respect to art in the Nazi era. Your adversaries say that, at least as I understand it, that, in fact, the Lefmans made a number of claims with respect to other pieces of art, but not with respect to the painting at issue in this case. You have a different view. Could you say a bit more about that? Sure. They retained it after the war. A German lawyer they knew who made claims under whatever regulations there were after the war in Germany, but they only covered items that were taken in Germany. They would not have covered this particular work, which had left Germany before the Lefmans left Germany and wasn't taken either by theft or duress while in Germany, and thus would not—we could spread this out at the trial court, but under those regulations, which are complicated, we submit that they could not have made a claim for this painting. I also say, Your Honor, that they were victims of the Holocaust and fascist repression, fleeing all over the world to save their lives and ending up back in the 1950s in Switzerland. One of the things you look at in terms of latches and whatnot is even whether the parties knew they had a claim. We're standing here today where we understand the jurisprudence following the Holocaust, but it's unclear what the Lefmans could have known then about their rights, having sold it under those kinds of pressures. So I do not believe there was any basis to the defendant's suggestion that they could have brought this claim in Germany after the war. But at any rate, we're now well beyond anything that could be resolved on a 12B6 motion. I don't believe any of this should be resolved on a 12B6 motion. But to the extent that this . . . even if we looked at this contract as voidable and not void, we're now addressing issues of ratification that go beyond any allegations in the complaint. We can't resolve it given the allegations in the complaint. That's your position, correct? My position first is they're not relevant. And if they were relevant, we certainly would have to have a very detailed and intensive fact inquiry on any of those issues. We believe the law covers it. Thank you. Thank you. Thank you, Your Honor. May it please the Court, my name is David Bowker with the Wilmer Hale Firm, appearing on behalf of Appali, the Metropolitan Museum of Art. I'd like to start with three basic points. One, that neither the district court nor the museum treated this as a run-of-the-mill transaction, and I'll get into the details of that assertion. Two, that the district court's dismissal for failure to plead duress was correct and should be affirmed. And three, that there are four additional independent reasons on which this court can affirm on the pleadings at a 12B6 stage, and I'll explain the reason for that. So let me return to point one. Neither the district court nor the museum treated this as a run-of-the-mill transaction. When the appellant came to the museum many years ago with questions about the 1938 transaction involving the painting, neither of us knew much about what had happened. The reason that the provenance had been stated the way it had been stated is that the museum didn't know otherwise. What we did in response is what the museum has done for decades in response to Nazi-era claims, and that is to take them seriously with appropriate sensitivity, integrity, and objectivity, and attention to the facts and to the merits. The museum, prior to any litigation, spent years investigating the circumstances of the 1938 sale and the circumstances of the Lefmans. It conducted that investigation across two continents, contacting governments, museums, galleries, dealers, and collected absolutely everything it could get its hands on that was relevant. It spoke to any individuals with any personal knowledge and shared all of that with the appellant and her counsel prior to litigation, holding nothing back, nothing back. It shared it all. The museum, after applying its own guidelines, which it helped the American Association of Museums develop for Nazi-era claims, concluded that that 1938 sale had not been the product of duress. I can say, having been a part of it, not as a fact witness but as an expression of the museum's state of mind, is that if the museum had believed this was a sale under duress, it would have given the painting back. The district court also did not treat this as a run-of-the-mill transaction. The district court accepted the allegations as true and spent roughly half of the opinion, some 19 pages, repeating nearly verbatim the horrific allegations in the complaint, including the Lefmans' state of mind. It analyzed those allegations with care and sensitivity and then concluded, based on the law, that the 1938 sale had not been the product of duress, concluding that those allegations failed to plead duress as a matter of law on the merits of that claim. Go ahead. So you say that if this had been a sale under duress, after full investigation, the museum would have returned the painting. So why don't you address the reasons for the museum's conclusion that it wasn't a sale under duress and focus first on New York law. I mean, I think the facts are clear. It was a sale under horrific pressure. So why, under New York law, would that not equate to duress? So we accepted the allegations as true, including the allegation that the Lefmans feared for their liberty and for their lives. We also accepted the allegation that the basis of that fear, and this is in paragraph 9 of the amended complaint, that the basis for that fear were the circumstances in fascist Italy at the time. There was no specifically directed threat, as Your Honor has pointed out, specific to this transaction. The threat was a general threat. So we recognize that they were under extreme pressure from the circumstances in Italy at the time because that's what's been alleged. But we have not accepted the conclusion that that means the 38th sale is voidable for duress. And what we need to do to figure that out is look at New York law. And New York law on this point is clear. And we've gone back and looked at New York court of appeals cases because that's what needs to guide the court. And the New York court of appeals cases that are most relevant are the Austin case, 29 New York 2nd, 124 at 130. That's a 1971 court of appeals case where it says, quote, a contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of free will. We go further and we look at the court of appeals case in 805 Third Avenue Company versus MW Realty. That's at 58 New York 2nd, 447 at 451, and that's in 1983. And this is where the requirement of the counterparty comes from New York law. This is a quote. The theory on which plaintiff seeks recovery permits a complaining party to void a contract and recover damages when it establishes that it was compelled to agree to the contract terms. Here's the key language. Because of a wrongful threat by the other party which precluded the exercise of its free will. Now, there are essentially three requirements here. A wrongful threat by the counterparty, two, that precludes the free will, and three, leaving no alternatives. What about third party duress? So, the third party duress point, I think my friend is mistaken about the law in New York. They have cited the Aileon case. The Aileon case is a summary order of this court that found no duress. And INDICTA cited the restatement, and the restatement obviously is not a statement of New York law. There is no discussion of New York law in Aileon. So, is there a case, New York State case, that directly deals, in your view, with third party duress of the New York Court of Appeals? We have found no New York case that permits third party duress. And we have found a New York Court of Appeals case that requires it to arise from the counterparty. What about New York pattern jury instructions which specifically permit third party duress? Are they just wrong? I think they don't have the support of the New York Court of Appeals. That said, I think this court doesn't need to decide this question. I think what's clear from New York law is whether the threat arises from a third party or from the counterparty. What's clear is that there needs to be a wrongful threat that is directed at the sale for a purpose of compelling consent in this transaction. Now, that's what Italy has to say. Italy does allow third party duress. But it says very clearly, as New York does, that it needs to be for the purpose of compelling consent, of extorting consent is the language in Italy. That's the same in New York. And so whether it arises, as the jury instructions say, whether it arises from a third party or arises from the counterparty, the point is a directed threat with purpose to extort consent. And that's why the contract becomes at issue is because there's something that has infected the contract. When you talk about duress, the district court, so far as I can understand, and please correct me, was focusing on economic duress. But why does duress, if indeed that's my understanding of the opinion is correct, why does duress have to just be economic duress? It can be emotional duress. It can be physical duress. Duress is a concept that seems to me is more expansive than just purely economic duress. Yes, Your Honor. The district court looked at economic duress because that's the argument and those are the allegations that the appellant made. The appellant said not that anyone was forcing this transaction, but rather the Lefmans had a general need to, in their words, raise as much cash as possible for, and this is a quote, whatever the future would bring. It's the flight and whatever the future would bring. And so the court, taking that allegation and taking that argument, looked at economic duress. Now, we've already dealt with the requirement of a wrongful threat. There are two more requirements under New York law. One is a preclusion of free will, and the last is leaving no alternatives but to enter into this transaction. So let's deal with each of those. One, the preclusion of free will. The allegations here, accepting them as true, show the opposite of a preclusion of free will. Now, appellant has said the Lefmans did not take years, but it's clear from the allegations that they took their time. They took at least months. The allegations say in paragraphs 28 to 37 of the amended complaint that they were attempting to sell months before the transaction entered into, that they rejected at least one offer shortly before the one they accepted, and that they made their own choice to accept the higher offer. This was a transaction that took place in Paris between private parties with no involvement by Nazis or fascists on the open market where they accepted the highest price. But in the context of the horrific situation, which you yourself acknowledge, where you have these Jews who were fearing really for their own lives, their family lives, and were trying to think of ways to amass capital in the event that they had to flee yet again, does it really make sense in the real world to say that this was an action wholly of free will? I think it does, Your Honor. The question is not whether the Lefmans were under pressure. We acknowledge they were, and it was horrific pressure. The question is whether this transaction can be unwound all these many decades later on the theory that they didn't exercise free will. Doesn't the purchase price three years later reflect that the price was depressed in 1938? They sold it for $12,000. Three years later, Foy bought it for almost twice as much. Doesn't that show that that $12,000 price reflects this duress? They would have gotten much more than that had there not been this problem they were facing to try to save their lives. That's the allegation, Your Honor, and we've accepted it, that the price was what it was in 1941. Do you have any reason to say that's not true, that that's the cost that Foy had? We do not, but I think the way to think about price in the years that are relevant here is that the markets were very tumultuous in these years. There was one sale that occurred in 1938, the sale at issue here. That's in Paris. Now, we submit that you can call that sale whatever you like, but it was negotiated on the open market with dealers at arm's length. It was negotiated. Now, it may have been a depressed market, but that doesn't mean it wasn't fair market value. It just means it was a depressed market. The market may have recovered in New York by 1941, or it may have been different in New York in 1941. Tell me that. Was it just economic factors, or was something going on even in Paris in 1938? I think storm clouds were very dark in Europe in the 1930s. I think there was a depression underway, and I think there were a lot of political factors, including the scourge of the Nazis and the fascists. And so the art market was, for years, unpredictable and tumultuous. The reason that we say that this was a reflection of their free will, it's not to discount the fear that they felt. It's to say that they felt that fear, and they made a decision to sell this painting and negotiated and took their time and decided what price to accept. I think it's very important to recall that they rejected an offer shortly before they accepted this one. Literally within months of this offer, they rejected another. Wasn't that offer for the same amount? It was for the same amount, which was the highest price that they'd been able to get. So what does that tell us? It tells us that they had enough free will to think that they could turn down an offer and wait and see if they could get a better one. And that is a display of free will. I think the last thing that the court focused on was this requirement of no alternatives. And this is where economic duress is important, because the court, again, looked very closely at the allegations in the amended complaint. Now, the appellant has drawn the conclusion, which is an element of duress, that there were no alternatives. What the Supreme Court says in Iqbal is this court doesn't need to accept, and the district court did not need to accept, even at a Rule 12b-6, which is Iqbal, does not need to accept a conclusion based on a restatement of an element of the claim. Instead, the court needs to use its common sense, use its experience, and look closely at the factual allegations. And if you look closely at the factual allegations with respect to alternatives, what you'll find is that they did have other assets. And the appellant has acknowledged that they had other assets. What the appellant has said is that the painting was the majority of available assets in 1938. But what the district court seized upon was that for the next decade, the Lefmans were able to afford their living expenses, a move to Switzerland, a move to Brazil, a move back to Switzerland, fees, bribes, fines, and deposits for the next decade without ever working again. And here's the important fact. In 1941 alone, three years after the sale, they made a deposit in a Brazilian bank. This is alleged at paragraphs 46 and 47. They made a deposit in a Brazilian bank of $20,000 and paid a levy of $4,600. That's twice the sales price of the painting three years later. And all the district court said is that they had other financial alternatives in this instance. So it's three elements and three ways in which the claim fails. Yes, Your Honor. Yes. We submit that the statute of limitations ran no later than 1955 because under New York law, it's a three-year statute. In 1952, the museum acquired this painting by gift. Mrs. Lefman was still alive at the time. She did not die until 1956. And as appellant has acknowledged, post-war claims were being made at the time in other venues. The need for demand and refusal is not present, according to this court in Songbird, if the possessor deals with the property as its own. Now, clearly, the museum here, in exhibiting the painting on its walls, having accepted a gift, dealt with this painting as its own and did for many decades before any claim was brought. We submit that that's plenty, including with the unreasonable delay, to defeat a demand and refusal argument. With respect to the HERE Act, I think Your Honor has put his finger on the relevant provisions here, and I would just add a couple of things. One is that the title of that act is the Holocaust Expropriated Art Recovery Act. That title says everything. It is about, as Your Honor noted, Nazi confiscations and looting. Expropriated art refers to those confiscations and looting. And it makes good sense that the U.S. government would give relief, especially for those families that didn't survive, where the original owners did not survive. This is a very different kind of case, with no Nazis involved, no fascists involved, no expropriations, where the family survived and the original owners brought claims for other things. I do want to correct the record on the claims for other things. I don't recall those other things being about art, as Your Honor suggested, but the point is not that they had a viable claim in Germany. They may or may not have. The point is that they had the capacity and the ability and the sophistication, certainly to repudiate, all that takes is an objection to the contract, and certainly to bring a claim in the right form. And according to their expert, Professor Ferghese, they had this claim in Italy that they chose apparently not to bring. There's no record that they brought it. Now, how do we, just drilling back on your point on the HERE Act, the Act does mention the Terezin Declaration, and the Terezin Declaration does explicitly refer to artwork sold under duress in the Holocaust era. So what does the HERE Act, how does the HERE Act relate to the Terezin Declaration? If the Declaration does mention the kind of circumstance, arguably, that the Lefmans find themselves in here, do we just ignore it as a matter of statutory interpretation? How do we interpret it? I think your Honor was correct that the HERE Act does not specifically incorporate the Terezin Declaration. It doesn't say that the Terezin Declaration rules apply. Rather, what it does is it cites to the Terezin Declaration for an articulation of policy. Now, let me read specifically the part of the HERE Act that refers to the Terezin Declaration. It's in Section 3, the purposes of the HERE Act. The purposes of this Act are the following, and this is a quote, Section 1, to ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration. So what does that say? That the laws governing claims to Nazi-confiscated art further this policy. And so we look to those rules, the declaration, for an articulation of policy. The policy that's articulated in those three instruments is a policy that, with respect to Nazi-era claims, courts are encouraged to resolve these claims on a, quote, fair and just basis, and then I'm ending the quote and paraphrasing, with a focus on the facts and the merits. Well, that's exactly what happened here. So even if this were applicable, and it's not because it refers to Nazi-confiscated art, and again, our case is not Nazi-confiscated art, but even if it were applicable, the district court did exactly what U.S. policy urges, and it doesn't require it, it doesn't speak to the substantive standards, it simply says, let's resolve these things in a fair and just way, focused on the facts and the merits. Judge Preska did that, and she did it, in our view, perfectly here. She looked very closely at the allegations, accepting them as true. She did a rigorous analysis of the choice of law, and even did and applied New York law properly to find that there was no pleading of duress under New York law. Then she did the alternative analysis, saying even if it were Italian law, there would be no pleading of duress under Italian law because the two are effectively the same, and there's no outcome-determinative difference. So we do assert that we have a very strong statute of limitations defense that is not alleviated by the HERE Act because the HERE Act is inapplicable, and moreover, we have a very strong latches defense. The latches defense here is the stronger, we would say, of the time bar defenses because it looks at two things. Has there been an unreasonable delay, and has there been prejudice to the possessor? As your adversary says, we don't usually resolve latches on a motion to dismiss. That's right, I think, where there are relevant factual issues in dispute. Here, we're accepting everything they've said. Even if you take the starkest articulation of the story, we've accepted it. We're not refuting anything relevant to any of these defenses. And if you look at it that way, discovery is not going to add anything. We've already accepted the truth. Discovery usually is to prove the truth of what's been alleged, and we've just accepted it and asked the court to decide not just on the basis of a failure to plead duress but also ratification, the good faith purchaser doctrine, the defense of statute of limitations, and latches. And we would say that those are five independent grounds. This court can affirm on any one of those grounds without the need to explore the facts because they've been accepted as true. Unless there are any further questions. Thank you. Your Honor, I just wanted to make one more point about the HERE Act. Further to what I said before, and I won't repeat it about the nomenclature used today in the HERE Act and generally, if you look at Section 5A, the statute of limitations general provisions, it states that a civil claim or cause of action against the defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than six years after the actual discovery by the claimant. That furthers what I was trying to explain earlier that lost, persecuted, are all being used interchangeably now in other parts of the statute that refer to the Nazi or their allies. And to suggest, the only other point I'll make is to suggest that a dismissal on a 12B6 motion honors the Washington Principles and Terrorism Declaration, saying that in a Holocaust case, the court should look at the facts and the merits, is irreconcilable in my view, Your Honor. Thank you very much, unless you have any further questions. Thank you both. Well argued on both sides. We very much appreciate your arguments. The court will reserve decision.